2023R00499/NKP/CW

**FILED**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

JUN 2 6 2023

AT 8:30
CLERK, U.S. DISTRICT COURT - NJ

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| | :   Hon. Michael A. Shipp |
| v. | : |
| | :   Crim. No. 23-511 |
| | : |
| STEVEN DIAMANTSTEIN | :   18 U.S.C. § 371 |
| | :   18 U.S.C. § 1349 |
| | :   18 U.S.C. § 670 |

### I N D I C T M E N T

The Grand Jury in and for the District of New Jersey, sitting at Newark,

charges:

### COUNT ONE

**(Conspiracy to Introduce Misbranded Drugs into Interstate Commerce
and to Defraud the United States)**

### BACKGROUND

1.     Unless otherwise indicated, at all times relevant to this Indictment:

### The Defendant and Relevant Entities and Individuals

a.     Defendant STEVEN DIAMANTSTEIN ("DIAMANTSTEIN") was

a resident of Brooklyn, New York.

b.     DIAMANTSTEIN was an owner and corporate officer of Scripts

Wholesale, Inc. ("Scripts"), a corporation organized under the laws of New York.

Scripts was a wholesale distributor of pharmaceutical products with a principal

place of business in Brooklyn, New York.

c.     Company 1 was a company organized under the laws of

Pennsylvania. Company 1 purported to provide legitimate prescription drugs, including expensive Human Immunodeficiency Virus ("HIV") medication, to wholesale distributors of pharmaceutical products.

d.     Individual 1 was the owner and operator of Company 1.

e.     Gentek LLC ("Gentek") was a company organized under the laws of Connecticut. Gentek purported to provide legitimate prescription drugs, including expensive HIV medication, to wholesale distributors of pharmaceutical products.

f.     My Meds LLC ("My Meds") was a company organized under the laws of Pennsylvania. My Meds purported to provide legitimate prescription drugs, including expensive HIV medication, to wholesale distributors of pharmaceutical products.

g.     Individual 2 brokered sales of pharmaceutical products for Gentek, My Meds, and other companies.

h.     Pharmacy 1 and Pharmacy 2, both of which were organized under the laws of New York, were based in Brooklyn, New York and Queens, New York, respectively. Pharmacy 1 and Pharmacy 2 purported to provide legitimate prescription drugs, including expensive HIV medication, to wholesale distributors of pharmaceutical products.

i.     Company 2 was a company organized under the laws of New Jersey with a principal place of business in New Jersey. Company 2 purported to provide legitimate prescription drugs, including expensive HIV medication, to wholesale distributors of pharmaceutical products.

j.    Individual 3 was associated with Pharmacy 1, Pharmacy 2, and Company 2.

k.    The U.S. Food and Drug Administration ("FDA") was the federal agency responsible for protecting the health and safety of the American public by, among other things, regulating the distribution and sale of prescription drugs and enforcing the Food, Drug, and Cosmetic Act ("FDCA"). One purpose of the FDCA was to ensure that drugs sold for use by humans were safe, were effective, and bore labeling containing only true and accurate information.

l.    Federal law, including Title 21, United States Code, Section 360eee-1, generally required that prescription drugs sold in the United States by or to wholesale distributors be accompanied by product tracing information, which consisted of transaction information, transaction history, and a transaction statement.    The product tracing information generally identified, among other things, the product, quantity, lot number, strength and dosage, date of each sale, and parties to each transaction.    Such product tracing information was commonly referred to in the industry as "T3s" or "pedigrees."

m.    Under the FDCA, "drugs" were defined as, among other things, articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease, pursuant to Title 21, United States Code, Section 321(g)(1)(B).  A "prescription drug" was any drug intended for use in humans that, because of its toxicity or potentiality for harmful effect, the method of its use, or the collateral measures necessary for its use, was not safe for use except

3

under the supervision of a practitioner licensed by law to administer such drug, or was limited by an approved application under Title 21, United States Code, Section 355 to use under the professional supervision of a practitioner licensed by law to administer such drug, pursuant to Title 21, United States Code, Section 353(b)(1).

n.    The introduction or delivery for introduction, or the causing thereof, into interstate commerce of any drug that was misbranded was a violation of federal law, pursuant to Title 21, United States Code, Section 331(a).

o.    A drug was misbranded if, among other things, its labeling was false or misleading in any particular, pursuant to Title 21, United States Code, Section 352(a)(1). A "label" was written, printed, or graphic matter upon the immediate container of the drug, while "labeling" was a broader term that included all labels and other written, printed, or graphic matter upon the drug or any of its containers or wrappers, or that accompanied the drug, pursuant to Title 21, United States Code, Sections 321(k) and (m).

### Prescription Drug Diversion

p.    The term "prescription drug diversion" referred to the various ways in which prescription drugs were removed from regulated distribution channels and subsequently unlawfully reintroduced into the wholesale marketplace. Common methods of prescription drug diversion included acquiring the drugs illegally through fraud or from individual patients for whom the prescription drugs had been prescribed and dispensed but intentionally not consumed. These diverted prescription drugs were then reintroduced into the

4

wholesale marketplace with false documentation concealing their true source and eventually dispensed to individual consumers by pharmacies, which also typically billed the drugs to "health care benefit programs," as defined by Title 18, United States Code, Section 24(b).  Once diverted from the regulated distribution channel, it became difficult for regulators and consumers to know whether a prescription drug was altered, stored in improper conditions, had its potency adversely affected, or was otherwise harmful.

### The Conspiracy

2.    From in or around February 2017 through in or around August 2021, in the District of New Jersey and elsewhere, defendant

**STEVEN DIAMANTSTEIN**

did knowingly and intentionally conspire with others:

(a)    to commit an offense against the United States, that is, with the intent to defraud and mislead, to introduce and deliver for introduction into interstate commerce, and cause to be introduced and delivered for introduction into interstate commerce, drugs that were misbranded within the meaning of Title 21, United States Code, Section 352(a) in that the drugs' labeling was false and misleading in any particular, contrary to Title 21, United States Code, Sections 331(a) and 333(a)(2); and

(b)    to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the FDA in its oversight and regulation of the interstate sale and

5

distribution of prescription drugs in the United States and its protection of the public health by ensuring that drugs are safe and effective.

## Goal of the Conspiracy

3.    It was a goal of the conspiracy for DIAMANTSTEIN and his co-conspirators to unlawfully enrich themselves by obtaining, selling, and distributing misbranded and diverted prescription drugs, including HIV medication, under false and fraudulent pretenses, representations, and promises, by claiming that the drugs had been acquired through legitimate channels of distribution and by providing false information about the source of those prescription drugs to conceal it from pharmacies, patients, and health care benefit programs.

## Manner and Means of the Conspiracy

4.    The manner and means by which DIAMANTSTEIN and his co-conspirators sought to accomplish the goal of the conspiracy included, among other things, the following:

a.    DIAMANTSTEIN and others established and obtained wholesale drug distributor licenses in numerous states, including in New Jersey.

b.    DIAMANTSTEIN and others purchased large quantities of diverted prescription drugs, including HIV medication, from Company 1, Gentek, My Meds, Pharmacy 1, Pharmacy 2, Company 2, and other suppliers ("the suppliers") of pharmaceutical products.

c.    The diverted prescription drugs, including HIV medication, that DIAMANTSTEIN and others purchased from the suppliers were obtained by

the suppliers primarily through unlawful diversion "buyback" schemes, in which previously dispensed bottles of prescription drugs were purchased in cash from patients, many of whom were HIV patients. In some instances, bottles that were falsely labeled as containing specific prescription drugs, including HIV medication, that DIAMANTSTEIN and others purchased from the suppliers and subsequently redistributed, did not contain the drugs on the label or labeling and instead contained different drugs.

d.      To further the conspiracy, and to conceal it from detection, DIAMANTSTEIN and others directed the suppliers to provide bottles of diverted prescription drugs, including HIV medication, that looked clean, unworn, and undamaged to hide that the bottles had been previously dispensed to patients.

e.      DIAMANTSTEIN and others purchased these diverted prescription drugs, including HIV medication, from the suppliers at steeply discounted prices, far below the pricing available for such drugs had they been acquired through legitimate and regulated channels of distribution and from distributors authorized by the drugs' manufacturers to distribute such drugs ("authorized distributors").

f.      To further the conspiracy, and to conceal and disguise it from detection, DIAMANTSTEIN and others inspected the previously dispensed bottles of diverted prescription drugs, including HIV medication, purchased from the suppliers for the purpose of identifying and returning bottles to the suppliers that appeared unclean, worn, or damaged, in order to conceal that bottles were obtained through unlawful diversion buyback schemes.

g.    To further the conspiracy, and to conceal and disguise it from detection, DIAMANTSTEIN, the suppliers, and others falsified, and caused to be falsified, T3s/pedigrees and other labeling to make it appear as though the diverted prescription drugs, including HIV medication, had been properly acquired through legitimate and regulated channels of distribution and from authorized distributors.

h.    DIAMANTSTEIN, the suppliers, and others falsified, and caused to be falsified, the transaction history information contained in T3s/pedigrees to fraudulently represent that the suppliers acquired the drugs, including HIV medication, from authorized distributors, which, in turn, had acquired the drugs directly from the drugs' manufacturers.

i.    DIAMANTSTEIN and others introduced these misbranded and diverted prescription drugs, including HIV medication, into interstate commerce by selling and distributing them for profit to pharmacies, including in the District of New Jersey, with false and fraudulent T3s/pedigrees and other labeling claiming that the drugs had been acquired and distributed in compliance with federal law and from authorized distributors.

j.    DIAMANTSTEIN and others distributed these misbranded and diverted prescription drugs, along with false and fraudulent T3s/pedigrees and other labeling, to pharmacies located throughout the United States, including in the District of New Jersey, to deceive pharmacies, patients, and health care benefit programs into believing that their supply of prescription drugs was legitimate.

   k. From in or around February 2017 through in or around August 2021, DIAMANTSTEIN purchased, and caused to be purchased, at least $150 million worth of diverted prescription drugs, including HIV medication, from Company 1, Gentek, My Meds, Pharmacy 1, Pharmacy 2, and Company 2.

**Overt Acts**

   5. In furtherance of the conspiracy, and to achieve its unlawful object, at least one member of the conspiracy committed and caused to be committed, in the District of New Jersey and elsewhere, at least one of the following overt acts:

   a. On or about October 2, 2017, DIAMANTSTEIN sent Individual 1 encrypted text messages stating, "[Brand name HIV medication is] the biggest mover" and "Any way to load up on that?" Individual 1 replied stating, "We order and get ship[sic] whatever it's[sic] there and give all to you."

   b. On or about October 17, 2017, DIAMANTSTEIN sent Individual 1 an encrypted text message requesting all the prescription HIV medication Individual 1 had available for sale.

   c. On or about December 21, 2017, DIAMANTSTEIN sent Individual 1 encrypted text messages stating, "I'm gonna get more cash to pump your way" and "We gonna do like 3 mill an order 😎[.]"

   d. On or about October 14, 2020, DIAMANTSTEIN and others caused a T3/pedigree, which listed false and fraudulent transaction history and transaction information for HIV medication sold to a pharmacy in the District of

9

New Jersey, to be sent via email to that pharmacy in New Jersey.

        e.     On or about October 27, 2020, Individual 2 sent DIAMANTSTEIN an encrypted text message stating, "There is some [brand name HIV medication] coming to you as well. Same conditions. If you don't sell in 60 days we take it back. Net 25 days terms [[wholesale acquisition cost] -19%[.]"

        f.     On or about October 27, 2020, DIAMANTSTEIN caused approximately $1 million to be wired to Gentek at Individual 2's request.

        g.     On or about November 2, 2020, DIAMANTSTEIN sent Individual 2 an encrypted text message stating, "Can you tell me [w]hat the pedigree looks like from [M]y [M]eds?" Individual 2 responded stating, "pretty much the same exact thing" and "almost same temp[]late."

        h.     On or about November 4, 2020, DIAMANTSTEIN sent Individual 2 several voice messages in which DIAMANTSTEIN proposed adding a pharmacy to the T3s/pedigrees of prescription drugs that DIAMANTSTEIN purchased through Individual 2, even though DIAMANTSTEIN knew such information was false.

        i.     On or about March 15, 2021, Individual 2 sent an associate located in the District of New Jersey encrypted text messages directing him to send diverted and misbranded drugs to pharmacies located in California and Florida on behalf of Scripts.

        j.     On or about March 15, 2021, the associate located in the District of New Jersey caused diverted and misbranded drugs to be sent to pharmacies located in California and Florida on behalf of Scripts.

k.    On or about March 15, 2021, Individual 3 sent an encrypted text message to DIAMANTSTEIN with a list of diverted drugs, including HIV medication, available for sale.

l.    On March 23, 2021, Individual 2 sent DIAMANTSTEIN an encrypted text message asking, "Are you disclosing the product and the issues to the manufacturer or fda?"  DIAMANTSTEIN responded to Individual 2 by encrypted text message stating, "No.  I'm gonna let everything just play out[.]"

m.    On or about April 1, 2021, DIAMANTSTEIN sent Individual 3 several voice messages with instructions for falsifying T3s/pedigrees.

n.    On or about April 1, 2021, Individual 3 sent DIAMANTSTEIN an encrypted text message requesting $1 million.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO

### (Conspiracy to Commit Wire Fraud)

6.    The allegations in paragraphs 1 and 3-5 above are realleged here.

7.    From in or around February 2017 through in or around August 2021, in the District of New Jersey and elsewhere, defendant

**STEVEN DIAMANTSTEIN**

did knowingly and intentionally conspire and agree with others to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts and omission of material facts, and, for the purpose of executing such scheme and artifice to defraud, did transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds, contrary to Title 18, United States Code, Section 1343.

### Goal of the Conspiracy

8.    It was a goal of the conspiracy for DIAMANTSTEIN and his co-conspirators to unlawfully enrich themselves by obtaining, selling, and distributing misbranded and diverted prescription drugs, including HIV medication, under false and fraudulent pretenses, representations, and promises, by claiming that the drugs had been acquired through legitimate channels of distribution and by providing false information about the source of those prescription drugs to conceal it from pharmacies, patients, and health care benefit programs.

**Manner and Means of the Conspiracy**

9.     It was part of the conspiracy and scheme to defraud that:

a.     DIAMANTSTEIN and others caused millions of dollars to be paid to Company 1, Gentek, My Meds, Pharmacy 1, Pharmacy 2, Company 2, and others to purchase diverted prescription drugs, including for HIV medication, resulting in interstate wire communications.

b.     DIAMANTSTEIN and others communicated with Individual 1, Individual 2, Individual 3, and others using the internet and other facilities of communication in connection with the purchase and sale of diverted prescription drugs, including for HIV medication, resulting in interstate wire communications.

c.     In connection with the sale and distribution of diverted prescription drugs, including HIV medication, to pharmacies, DIAMANTSTEIN and others transmitted, via interstate wire communications, false and fraudulent T3s/pedigrees and other documentation, deceitfully claiming that the drugs had been acquired through legitimate channels of distribution and from authorized distributors, and concealing accurate information about the unlawful source of the drugs from purchasing pharmacies, which dispensed the diverted drugs to patients and billed health care benefit programs for them.

d.     As a result of the materially false and fraudulent pretenses, representations, and promises that DIAMANTSTEIN and others made, and caused to be made, about the prescription drugs, including HIV medication, that they sold and distributed, and as a result of DIAMANTSTEIN and others'

concealment and omission of material facts about prescription drugs, pharmacies, patients, and health care benefit plans were deceived. These materially false and fraudulent pretenses, representations, and promises caused pharmacies, patients, and health care benefit programs to pay DIAMANTSTEIN and others for prescription drugs that were obtained unlawfully, that were supplied through illegitimate and unregulated channels of distribution, and that, at times, were not the prescription drugs that DIAMANTSTEIN and others purported them to be.

        e.      DIAMANTSTEIN and others used the proceeds of the fraud for their own benefit, the benefit of others, and to further the fraud.

All in violation of Title 18, United States Code, Section 1349.

## COUNT THREE

### (Conspiracy to Traffic in Pre-Retail Medical Products with False Documentation)

10.    The allegations in paragraphs 1 and 3–5 above are realleged here.

11.    From in or around February 2017 through in or around August 2021, in the District of New Jersey and elsewhere, defendant

### STEVEN DIAMANTSTEIN,

an owner and agent of an organization in the supply chain for pre-retail medical products, did knowingly and willfully attempt and conspire with others to knowingly and falsely make, alter, forge, and counterfeit the labeling and documentation of pre-retail medical products, and to knowingly possess, transport, and traffic in pre-retail medical products involving false, altered, forged, and counterfeited labeling and documentation, in and using a means and facility of interstate commerce, contrary to Title 18, United States Code, Sections 670(a)(2) and (3).

In violation of Title 18, United States Code, Sections 670(a)(6) and (b)(1).

## FORFEITURE ALLEGATIONS

1.     The allegations contained in this Indictment are realleged here for the purpose of alleging forfeiture.

2.     Upon conviction of any federal health care offense, including any violation of Title 18, United States Code, Section 1343 or Title 21, United States Code, Section 331, or a conspiracy to commit such offenses, relating to a health care benefit program, as alleged in this Indictment, defendant

### STEVEN DIAMANTSTEIN

shall forfeit to the United States any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of the offense, pursuant to Title 18, United States Code, Section 982(a)(7).

3.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

      a.     cannot be located upon the exercise of due diligence;

      b.     has been transferred or sold to, or deposited with, a third person;

      c.     has been placed beyond the jurisdiction of the Court;

      d.     has been substantially diminished in value; or

      e.     has been commingled with other property which cannot be subdivided without difficulty,

the United States of America shall be entitled to forfeiture of substitute

property pursuant Title 21, United States Code, Section 853(p).

A True Bill,

Foreperson

*Philip R. Sellinger*
PHILIP R. SELLINGER
United States Attorney

GLENN S. LEON
Chief
Criminal Division, Fraud Section
U.S. Department of Justice

REBECCA YUAN
Acting Assistant Chief
Criminal Division, Fraud Section
U.S. Department of Justice

NICHOLAS K. PEONE
CHRISTOPHER WENGER
Trial Attorneys
Criminal Division, Fraud Section
U.S. Department of Justice

CASE NUMBER: ___23-CR-511_____

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

### UNITED STATES OF AMERICA

### v.

### STEVEN DIAMANTSTEIN

## INDICTMENT FOR

**18 U.S.C. § 371**
**18 U.S.C. § 1349**
**18 U.S.C. § 670**

**A true bill,**



**Foreperson**

PHILIP R. SELLINGER
UNITED STATES ATTORNEY
FOR THE DISTRICT OF NEW JERSEY

CHRIS WENGER
NICHOLAS K. PEONE
TRIAL ATTORNEYS
(202) 445-9670